**SWISHER et al. v. UNITED STATES.**
Nos. 1837, 1838.

Circuit Court of Appeals, Tenth Circuit.
Feb. 9, 1940.

Rehearing Denied Feb. 26, 1940.

BRATTON, Circuit Judge, dissenting in part.

———◆———

James T. Burke, of Denver, Colo. (Harold B. Newrock, of Lafayette, Colo., and Andrew J. Reynolds, of Denver, Colo., on the brief), for appellants.

David H. Morris, Asst. U. S. Atty., of Denver, Colo. (Thomas J. Morrissey, U. S. Atty., of Denver, Colo., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

LEWIS, Circuit Judge.

Pursuant to Title III of the Agricultural Adjustment Act, 48 Stat. 51, 31 U.S.C.A. § 821 et seq., and the advisory opinion of the Attorney General (37 Ops. Attys. Gen. 344), the President, by proclamations and his approval of rules and regulations by the Secretary of the Treasury on the subject, put into effect in 1933 and maintained thereafter "a plan for the unlimited coinage of domestic silver produced after the effective dates of the proclamations."

Congress in Section 13 of the Act of January 30, 1934, 48 Stat. 337, 343, 31 U.S.C.A. § 824, expressly approved, ratified and confirmed "All actions, regulations, rules, orders, and proclamations heretofore taken, promulgated, made or issued by the President of the United States or the Secretary of the Treasury, under Act of March 9, 1933 [sections 201 to 211 of Title 12], or under section 43 [821] or section 45 [823] of Title III of the Act of May 12, 1933 [this title]," the Agricultural Adjustment Act.

The first proclamation of the President under the Agricultural Adjustment Act was promulgated December 21, 1933. 48 Stat. (Part 2), page 1723. Among other things it provided:

"that each United States coinage mint shall receive for coinage into standard silver dollars any silver which such mint, subject to regulations prescribed hereunder by the Secretary of the Treasury, is satisfied has been mined, subsequently to the date of this proclamation, from natural deposits in the United States or any place subject to the jurisdiction thereof. * * * [Such regulations] prescribing how silver mined, subsequently to the date of this proclamation from natural deposits in the United States or any place subject to the jurisdiction thereof, shall be identified."

He modified and supplemented that proclamation by proclamation of August 9, 1934, 49 Stat. 3402, in which he also relied on the silver purchase act of 1934, 48 Stat. 1181, Section 13 of which contains this: "The authority conferred in this act [said sections] on [upon] the President and the Secretary of the Treasury is declared to be supplemental to the authority heretofore conferred." 31 U.S.C.A. § 448e. The regulations provided that they might be modified from time to time. Those approved by the President as of May 15, 1935, as did those of prior and subsequent dates, generally provided that they related to the receipt, purchase and coinage by the United States coinage mints of silver mined in the United States or any place subject to the jurisdiction thereof pursuant to the proclamations of December 21, 1933, as amended; and that the United States coinage mints under conditions specified in the regulations and subject to the appropriate regulations governing the mints will receive silver which any such mint is satisfied has been mined subsequent to December 21, 1933, from natural deposits in the United States or any place subject to the jurisdiction thereof. They further provided:

"Such mints will also receive silver which forms a part of a mixture of domestic, secondary, and/or foreign silver provided such mints are satisfied that the aggregate

amount of such mixture so received does not exceed the amount of such mixture which has been mined subsequent to December 21, 1933, from natural deposits in the United States or any place subject to the jurisdiction thereof, and, provided further, that such mints are satisfied—

"(a) That the aggregate amount of such mixture so received pursuant to the proclamation of April 10, 1935, amending the proclamation of December 21, 1933, as amended, does not exceed the amount of such silver which has been mined on or after April 10, 1935, from natural deposits in the United States or any place subject to the jurisdiction thereof; and

"(b) That the aggregate amount of such mixture so received pursuant to the proclamation of April 24, 1935, amending the proclamation of December 21, 1933, as amended, does not exceed the amount of such silver which has been mined on or after April 24, 1935, from natural deposits in the United States or any place subject to the jurisdiction thereof."

The rules prescribe two kinds of affidavits that shall be filed with the mint on each delivery to it of silver, thus:

"(a) Every person delivering silver mined subsequent to December 21, 1933, but prior to April 10, 1935, under the provisions of the proclamation of December 21, 1933, as amended, shall file with each such delivery a properly executed affidavit on form TS–1 and supporting affidavit or affidavits of the miner or miners on form TS–2 or TS–2A, whichever is appropriate, containing the information called for in such forms and executed under oath before an officer duly authorized to administer oaths.

"(b) Every person delivering under such proclamation, as amended, silver which has been mined on or after April 10, 1935, but prior to April 24, 1935, shall file with each such delivery a properly executed affidavit on form TS–100 and supporting affidavit or affidavits on form TS–200 or form TS–200A, whichever is appropriate, containing the information called for in such forms and executed under oath before an officer duly authorized to administer oaths."

The following paragraph is not different from the one just quoted except it refers to a proclamation of date April 24, 1935, instead of April 10, 1935. It was further required that persons delivering silver shall furnish such further evidence as may from time to time be requested by the mint or its director, including affidavits and sworn abstracts from books of account from any mines or any or all smelters or refineries handling such silver. Every person making deliveries was required by the regulations to keep accurate records of all acquisitions by mining or otherwise and of all dispositions of all silver mined subsequent to December 21, 1933, including, among other things, records of the date when such silver was mined, acquired and disposed of, which records should be preserved for at least one year after delivery and made available for examination by the director of the mint upon request. Persons making deliveries were also required to make monthly reports to the mint of the deliveries that had been made.

The Secretary provided printed forms of the two kinds of affidavits, one to be made by the person delivering the silver for sale and the other to be made by the miners of newly mined silver when newly mined or a mixture of silver was presented and delivered to the mint for sale, or by persons having knowledge of the fact. The first affidavit so required was made by the owner and is referred to throughout the record as the principal affidavit, and the second kind of affidavit is called the miner's supporting affidavit. As already said, these affidavits of both kinds were presented to and retained by the mint with each delivery and purchase of silver. The principal affidavit stated the number of ounces of silver bullion tendered for delivery. The mint did not accept that weight, but reweighed it, and reassayed it, and on that weight and assay calculated the total purchase price and paid that sum less the seigniorage. There is sharp conflict in the proof as to what might or should be done if the tendered silver was a mixture of newly mined and non-newly mined, or containing or not containing foreign silver, or containing only common domestic silver.

There were 90 counts in the indictment, 19 of them being based on a principal affidavit, each made by the owner who presented it when the silver was tendered to the mint. The first count of that type, the first count in the indictment, charged that Gibson and Swisher on or about the 21st day of February, 1936, within the jurisdiction of the District Court, then and there, unlawfully, wilfully and fraudulently did make and cause to be made and used a false affidavit, to-wit, an affidavit designated as " 'Affidavit and Agreement by Own-

er Relative to Silver Mined on or after April 24, 1935,' being form TS-1000, Treasury Department, in a matter within the jurisdiction of the United States Treasury Department, United States of America, and the Denver Mint thereof, to-wit, the purchase of silver, and that said affidavit was then and there of the following tenor and effect, to-wit:" The affidavit is then set forth. It contains this:

"In accordance with the provisions of the Proclamation of December 21, 1933, as amended by the Proclamations of August 9, 1934 and April 10 and April 24, 1935, and the Regulations prescribed thereunder, the undersigned hereby represents and certifies under oath that he is the president of Colorado Smelting & Refining Co., the owner of certain silver to the amount of 2951.72 fine troy ounces, more or less, forwarded to the United States Mint at Denver (Dist.) Colo., on the 21st day of February, 1936, and delivered to the Mint under the provisions of said Proclamation of December 21, 1933, as amended and the regulations prescribed thereunder; and that said silver*

"(1) has been mined on or after April 24, 1935, and prior to midnight of December 31, 1937, from natural deposits in the United States or a place subject to the jurisdiction thereof,

"(2) or is part of a mixture of domestic, ~~secondary and/or foreign~~ silver and does not, together with any part of such mixture heretofore delivered or transferred by the undersigned to a United States Coinage Mint under the proclamation of April 24, 1935, amending the proclamation of December 21, 1933, as amended exceed the amount of such mixture which has been mined on or after April 24, 1935 and prior to midnight of December 31, 1937, from natural deposits in the United States or a place subject to the jurisdiction thereof. *Strike out whichever clause is inapplicable.

"The owner is filing herewith supporting affidavits by the miners, and agrees to furnish such additional evidence as may hereafter be demanded by the Secretary of the Treasury, including affidavits and sworn abstracts from books of account of any or all reduction works handling such silver.

"The owner hereby voluntarily consents that the Mint may deduct and retain of such silver so received forty per cent as seigniorage and for services performed by the Government of the United States relative to the coinage and delivery of silver dollars. The owner also consents to accept from the Mint in standard silver dollars, silver certificates, or any other coin or currency of the United States, the monetary value of the silver so received (that is, $1.2929 plus a fine ounce), less such deduction of forty per cent. * * *

"This affidavit is made for the purpose of inducing the said Mint to accept the silver described herein for coinage in accordance with the provisions of the Proclamation of April 24, 1935, which amended the Proclamation of December 21, 1933, as amended, and the Regulations prescribed thereunder.

"Colorado Smelting & Refining Co.
"By Theo. J. Swisher, President.

"Subscribed and sworn to before me this 21st day of February, 1936.

"Notarial Seal    Clarence W. Gibson"

The charge of the Grand Jury immediately following the inserted affidavit of the owner continues:

"knowing the same to contain certain fraudulent and fictitious statements, to-wit:

"That the said 2951.72 fine troy ounces, more or less of silver

"(1) had been mined on or after April 24, 1935 from natural deposits in the United States or a place subject to the jurisdiction thereof, or was a part

"(2) of a mixture of domestic silver which did not together with any part of such mixture heretofore delivered or transferred by the said Clarence W. Gibson and Theo. J. Swisher to a United States Coinage Mint under the Proclamation of April 24, 1935, amending the Proclamation of December 21, 1933, as amended, exceed the amount of such mixture which had been mined on or after April 24, 1935 from natural deposits in the United States or a place subject to the jurisdiction thereof;

"That the statements contained in said affidavit were false and fraudulent in this, to-wit, that in truth and in fact the said 2951.72 fine troy ounces, more or less, of silver had not been mined on or after April 24, 1935 from natural deposits in the United States or a place subject to the jurisdiction thereof;

"And were not a part of a mixture of domestic silver, which together with any part of such mixture theretofore delivered or transferred by the said Clarence W. Gibson and Theo. J. Swisher to a United States Coinage Mint under the Proclamation of April 24, 1935, amending the

Proclamation of December 21, 1933, as amended, did not exceed the amount of such mixture which had been mined on or after April 24, 1935 from natural deposits in the United States or a place subject to the jurisdiction thereof; and that in truth and in fact, the said 2951.72 fine troy ounces, more or less, of silver was commercial and industrial silver, and not newly mined silver; and not a mixture of domestic silver, which did not exceed the amount of such mixture which had been mined on or after April 24, 1935 from natural deposits in the United States, or a place subject to the jurisdiction thereof; all of which the said defendants, Clarence W. Gibson and Theo. J. Swisher, then and there well knew;

"Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

Each of the remaining 71 counts was based on a miner's affidavit, the form of which was prescribed by the Secretary of the Treasury in his rules and regulations. A miner's affidavit is embodied in count two, and it is charged by the Grand Jury that the defendants, appellants here, did—

"unlawfully, wilfully, knowingly, fraudulently and feloniously make and cause to be made and used a false affidavit, to-wit, a certain affidavit designated as 'Affidavit of Miner Relative to Silver Mined on or after April 24, 1935' Form TS-2000, Treasury Department, in a matter within the jurisdiction of the United States Treasury Department, United States of America, and the Denver Mint thereof, to-wit, the purchase of silver; that said affidavit was then and there of the following tenor and effect, to-wit:"

Said miner's affidavit was made by one Morris on December 20, 1935, before appellant Gibson, a notary public. He deposed that he was lessee of Gottfried Johnson, the owner of a mine known as Gottfried Johnson Mining Claim in Georgetown District in Clear Creek County, Colorado; that he had delivered to Colorado Smelting & Refining Company on the 19th day of December, 1935, at its smelting plant in Denver, Colorado, 922 fine ounces of silver, which was mined on or after April 24, 1935, from natural deposits at said mine. The Grand Jury's charge continues:

"knowing the same to contain certain false and fictitious statements, to-wit:

"That 922 fine ounces of silver had been mined on or after April 24, 1935, at the Gottfried Johnson mining claim, or in the Georgetown District, Clear Creek County, Colorado, from natural deposits located at said Gottfried Johnson mining claim, or in the Georgetown District, Clear Creek County, Colorado;

"That in truth and in fact the said 922 fine ounces of silver had not been mined on or after April 24, 1935, at said Gottfried Johnson Mining Claim, or in the Georgetown District, Clear Creek County, Colorado from natural deposits located at said Gottfried Johnson Mining Claim, or in the Georgetown District, Clear Creek, Colorado, all of which the said defendants, Clarence W. Gibson and Theo. J. Swisher, then and there well knew;

"Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States of America."

The miner's affidavit made by Harry W. Lawrence, Jr., is embodied in count 3 of the indictment. He deposed that he was lessee of one Stevens, owner of King of the Ranch Mine in Gilpin County, and that he had delivered to the Colorado Smelting & Refining Co. on the 9th day of January, 1936, at its smelting plant in Denver 488.20 fine ounces of silver which was mined on or after April 24, 1935, from natural deposits at said mine. A miner's affidavit was embodied in count 4 of the indictment made by one Meyer on January 4, 1936, before appellant Gibson. He deposed that he and his father were working the Miracle Mine in Boulder County, and that on January 2, 1936, he delivered to the Colorado Smelting & Refining Co. at its smelting plant in Denver 275 fine ounces of silver which was mined on or after April 24, 1935, from natural deposits at said mine. These three miner's affidavits by Morris, Lawrence and Meyer were delivered with the principal affidavit set forth in count 1 to the mint along with a shipment of 2951.72 ounces of silver. The weight was reduced to the extent of 22 ounces by the mint, and the appellants were then paid the proclamation price of 77¢ per ounce.

Mr. Morris testified that when he made the miner's affidavit embodied in count 2 he did not deliver 922 fine ounces of silver; that he delivered about 370 pounds of ore from which about 70 fine ounces of silver was obtained; that when he signed the affidavit the spaces for those matters were

blank and that he left the affidavit at the smelter, the blanks to be filled when the correct amount was ascertained; and that he received $58 for what he delivered. Mr. Lawrence, who made the miner's affidavit in count 3, gave the same kind of testimony; that he signed the affidavit with blank spaces unfilled; that he made two shipments to the Colorado Smelting & Refining Co., one containing 56.34 ounces and the other 61.88 ounces, and that was the whole amount for which he was paid. Meyer gave like testimony; that the blanks were not filled when he signed the affidavit; that he left the affidavit with the Colorado Smelting & Refining Co.; that he made only one shipment of silver to that company which contained only three ounces of silver for which he received $18; that he had never sold or delivered 275 ounces of silver as stated in the affidavit. These three witnesses each admitted their signatures to the affidavits, but denied that the blanks had been properly filled in them.

Returning now to what is called the principal affidavit, there are several matters that seem to require attention. The first is that the affidavit seems to be self-contradictory. In that part of it included in paragraph (1) immediately following the asterisk Mr. Swisher deposed that all the silver tendered for purchase (2951.72 oz.) was newly mined silver, that is, it had all been mined after April 24, 1935, the date of an amending proclamation, whereas in paragraph (2) he deposed that it was a mixture of domestic and secondary or domestic and foreign silver. This also is embodied in the indictment. So we have in both charge and proof this contradiction as to the kind of silver that was being presented to the mint for purchase. The error was pointed out by the asterisk in the principal affidavit. Furthermore, the words "secondary and/or foreign" in said paragraph (2) were stricken out. We are not advised by whom. The Secretary of the Treasury was the only person authorized to make and change the rules and regulations. We find no evidence indicating who struck out these words in the principal affidavit. We think we must read it as though they were still in that affidavit.

■ There were motions to quash and for bill of particulars, both denied. A separate verdict in general terms was returned on each count, the number of the count and no more in particularization being stated. 1 Wharton on Criminal Law,

Section 382, says: "A count in an indictment which charges two distinct offences, is bad, and the defendant on a motion to quash, or demurrer, can defeat it." In the body of the Grand Jury's charge is this: "That the statements contained in said affidavit were false and fraudulent in this, to-wit, that in truth and in fact the said 2951.72 fine troy ounces, more or less, of silver had not been mined on or after April 24, 1935, from natural deposits in the United States or a place subject to the jurisdiction thereof; And were not a part of a mixture of domestic silver etc., and not newly mined silver, and not a mixture of domestic silver; * * * all of which the said defendants Clarence W. Gibson and Theo. J. Swisher then and there well knew." Undoubtedly the two offences could have been properly charged in separate counts. Epstein v. United States, 2 Cir., 271 F. 282. Thus the defendants on the first count, and there were several others just like it, were put in double jeopardy as to both of those offences, when the jury was sworn. There is now no way of determining from the record made in the case of which offence charged in the first count the defendants were found guilty. They might now be indicted for either offence charged in the first count, and be unable on the record to defend against the charge. The court could, I think, have protected defendants in its charge to the jury and in the form of verdicts on count one by confining the jury to one or the other of the offences therein charged. The prosecutor also could have avoided the hazard by electing on which of the offences thus charged he would stand. So it appears that the overruling of the motion to quash was prejudicial error as to that count and all others like it, and there should be an order of reversal and remand on all of those counts. In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 630, 79 L.Ed. 1314, the court said: "The general rule that allegations and proof must correspond is based upon the obvious requirements * * and (2) that he may be protected against another prosecution for the same offense."

The District Attorney relies on section 80, 18 U.S.C.A., as defining the crimes charged.

Mr. Meginness, clerk at the mint for several years, received many deposits of gold and silver. He testified that immediately after December 21, 1933 (first proclama-

tion) the price for newly mined silver was 64.64c per ounce. That prevailed until April 10, 1935, and then (under new proclamation of that date) it went to 71c plus per ounce. That prevailed until April 24, 1935, when (under new proclamation) it went to 77½c plus, and that prevailed until December, 1937, when it went back to ·64.64c. That was the price at the time this case was tried. He testified that the market price of commercial silver, not newly mined, was in the neighborhood of 42–44 cents per ounce. He had possession of the affidavits made at the time silver was presented for deposit and sale, both the principal and the miner's affidavits, and produced them in court. They were offered in evidence for the respective puposes indicated. He testified that miner's affidavits must be filed with the principal affidavit in order to secure the proclamation price for newly mined silver. Finally he was asked this question:

"Mr. Meginness, the price of newly mined silver and the price of mixture delivered under these so-called principal affidavits was the same; is that not right? A. I wouldn't want to answer that question outright that way. That would have to be explained.

"Q. Surely. Go right ahead and explain it. A. All right. First that affidavit reads—it means just this: that we cannot in looking at a bar of silver tell what it is made up of, whether it is made up of newly mined silver, or a silver that had been mined prior to the proclamations, and therefore a paragraph has been inserted in that affidavit which says or allows the party depositing the silver to keep back newly mined silver, and bring in this other silver in the place of it, because we know in the process of reducing ore to silver bullion that it is impossible to keep—say they have newly mined silver and silver that was mined prior to the proclamations, they can't keep that separated in running a big mill, and therefore this paragraph has been inserted which allows them to make the affidavit stating that they have an equal amount set apart of newly mined silver. Therefore these affidavits that have been submitted apply to newly mined silver, and yet the silver that they have deposited may be silver that was mined prior to the proclamation, and it may be silver that was mined after the proclamation. Therefore it takes the new price, because they have the supporting affidavits. If they did not

have the supporting affidavits, any silver of that kind would come in and be paid for at the market price, which would be at the price of forty-two to forty-four cents.

"Q. If it stated it was all newly mined silver or this mixture, the price is the same? A. That is the price that was paid on the particular affidavit you mention.

"Q. Well, how about the others? Any difference? A. Those deposits of silver as far as I know—I can't positively state, because I don't write the checks, but as far as my knowledge goes, they were paid for at the newly mined price.

"Q. Yes, whether they were a mixture or all newly mined? A. Yes, sir."

On redirect examination Mr. Meginness testified:

"Q. Now, Mr. Meginness, could the mixture of domestic silver contain secondary silver and get the price under the proclamation? A. It could not on this affidavit, because the secondary silver and the foreign silver have been stricken out. * * * A. The word 'secondary' had been stricken out here, but if it had been included in there with newly mined and the domestic silver that was mined prior to that, and, as they swore to in the affidavit, they have an equal amount of newly mined silver set aside, we could have accepted it if that word 'secondary' had not been crossed out.

"Q. Mr. Meginness, if the silver sold to the Mint under this affidavit was a mixture of domestic silver, and did not come with any other such part—what would the parties who sold that silver have to have in reserve? A. They would have to have newly mined silver in reserve.

"Q. To cover that part that was not newly mined in proportion to the amount that they sell. A. Exactly.

"Q. And what price would the newly mined silver that they keep in reserve have to be paid or sold to the Mint for? A. They would have no supporting affidavits for that. Therefore it would have to be sold at the market price, which is around forty-two to forty-four cents."

Mr. Skinner, superintendent of the mint at Denver, was called as a witness by the prosecution. He testified that newly mined silver was silver that had been mined on and after the effective date of the Presidential proclamation; that secondary silver was silver that had been used in the arts and industries, tableware, photography,

and various industries; and that foreign silver is silver produced in countries not under the jurisdiction of the United States. He was asked:

"Now, if silver was sold to the United States Mint under paragraph (2), if paragraph (1) was scratched out (referring to the principal affidavit), what would be the requirements then so far as the owner is concerned? What would he have to have on hand? A. He would have to have a sufficient amount of silver to equal the number of ounces shown in the principal affidavit, which had been mined subsequent to the proclamation under which the silver was being delivered. He would have to have the equal amount of ounces of newly mined silver.

"Q. And when he went to sell that, what would happen if he didn't? A. It would be sold as domestic or secondary silver. * * *

"Q. Mr. Skinner, I don't believe it is quite clear with reference to when the Mint accepts a mixture of newly mined with domestic, secondary or foreign silver. * * *

"Q. I don't believe it is clear what you mean when you say he should have on hand newly mined silver to an amount equal to the secondary or foreign silver which is included in the affidavit which you now hold in your hand? A. Do you want me to explain that?

"Q. Yes, I would, Mr. Skinner. A. In the process of recovering and reducing silver of various kinds it sometimes becomes impossible to make a physical separation of the various kinds of silver, newly mined, domestic or foreign. Therefore, they are permitted to sell to the United States Mint under these affidavits an amount equal to the newly mined silver which they have mined or have purchased, but they must be supported by supporting affidavits setting forth that amount of silver equal to the total amount which they have sold, or connected to the principal affidavit. In other words, the supporting affidavits relate to the newly mined silver only. * * *

"Q. But they must be attached to the affidavit on top which you have referred to as the principal affidavit, which does refer to the mixture? A. Yes, that refers to the mixture. In other words, they say, if they have the whole amount, that part of this 1,000 ounces which they deposit consists of newly mined, domestic being silver

produced in the United States prior to the proclamation. Foreign silver—that is, that it is a mixture of those three kinds of silver, but they have on hand and there has been delivered to them an amount of silver mined subsequent to the proclamation equaling the amount of the affidavit or of the shipment.

"Q. That silver that they have on hand they can't get the premium price on? A. No, that would have to be sold as domestic or secondary silver.

"Q. What is the advantage to the miner in permitting him to substitute secondary silver for newly mined silver? A. The miner doesn't substitute.

"Q. Well, or the owner? A. The owner usually has either a reduction plant or refinery. In his operations, as I said before, it sometimes becomes impossible to make a physical separation of the various silvers, different kinds of silver, that he is passing through his daily operation. * * *

"Q. Will you look through that affidavit and see if you can find a statement there concerning the retaining on hand of this newly mined silver? A. I don't see that there is anything, but he must have on deposit that he did purchase from producers an amount of newly mined silver to equal the amount of silver delivered to the United States Mint in order to receive that price. Now, if there was any foreign or domestic silver in there, he must of necessity retain in his possession an amount equal to that difference. * * *

"Q. Then there would be no particular advantage in selling secondary or a mixture of newly mined and other silver if he had to have on hand and keep in his possession an amount of newly mined silver that he could not sell to the Mint, and not bother with the secondary silver at all; is that right? A. Well, he gets the same price for this mixture that he would get for the newly mined, and in order to facilitate his operations and not be compelled to make a physical separation, he would have the advantage of making the sale to the government for the newly mined price, and the secondary could be sold, or whatever silver he had left representing the secondary and imported silver could be sold at the market price, so it would be an advantage."

The Colorado Smelting and Refining Company is a corporation. It has a small smelting and refining plant in Denver, and was under the sole management and con-

trol of appellants. There was also a small reduction plant in Boulder County which they controlled and managed. It did not smelt any ore, and appellants obtained silver concentrates and precipitates therefrom. They brought some of the ore purchased at that plant to the Denver plant and there obtained the silver bullion which it contained. The greater part of the ore obtained at the Boulder plant seems to have been sent to a smelter at Leadville.

In counts 65 and 82 all of paragraph (2) is stricken from the principal affidavits. All of paragraph (1) remained in said principal affidavits, as was directed by the form of that affidavit should be done when it was prepared and sent out by the Secretary of the Treasury. As thus prepared and used at the Secretary's direction, Mr. Swisher under oath stated in the affidavit embodied in count 65 that the Colorado Smelting and Refining Company was the owner of 1590 fine troy ounces more or less forwarded to the mint at Denver on the 23rd day of March, 1938, and delivered to the mint under the President's proclamation and regulations prescribed thereunder, and that said silver had been mined on or after January 1, 1938, from natural deposits in the United States or a place subject to the jurisdiction thereof; that the owner was filing therewith supporting affidavits by the miners and agrees to furnish such additional evidence as may be demanded by the Secretary of the Treasury. Four affidavits of that kind were attached. The mint accepted these affidavits, cutting down however the said silver to 1545.35 ounces and paying appellants for that amount of newly mined silver. It is charged in the 65th count that appellants knowingly falsified these affidavits, principal and miner's, which represented on their face that all the 1590 ounces was newly mined silver. One of the miner's affidavits was made by G. A. Sherman as general manager of Pherson & Co. It stated that Pherson & Co., as lessee of the Concord mine in Boulder county, Colorado, had delivered to the Colorado Smelting and Refining Company upon the 14th day of January, 1938, 788 fine ounces of silver which was mined after January 1, 1938, from natural deposits at said mine. Sherman testified at the trial that he signed the affidavit; that the space for the amount of silver so delivered was blank when he signed; that he did not deliver 788 fine ounces of silver as stated therein to the Colorado Smelting and Refining Company; that only one delivery of silver was made,

and the true amount so delivered was 17.88 fine ounces; that defendants later sent him a settlement sheet which he produced, and it showed the true amount to be 17.88 ounces. That settlement sheet was offered in evidence. Another miner's affidavit in support of the principal affidavit in count 65 was made by one Mester. He was associated with one Smith. They made 17 shipments of ore from the Archer mine at Sunshine, Colorado, to the Colorado Smelting and Refining Company at the Gorham plant, and his affidavit, which he admitted signing, states that he and Smith delivered 544 fine ounces of silver mined on or after January 1, 1938, from natural deposits at said mine; that that delivery was made on February 16, 1938. He testified at the trial that 16 of said shipments contained no silver; that a shipment made on February 21 was settled for as containing 10.01 ounces for which $5.80 was received. He had settlement sheets for all shipments. Another miner's affidavit signed by one Edmunds in support of the principal affidavit in count 65 was presented to the mint with the shipment in count 65. It represented that 156 ounces of newly mined silver had been delivered to the mint on the 4th day of March, 1938. Edmunds testified that he delivered silver bearing ore to the two appellants, but not as much as 156 ounces. He never stated the amount of that delivery. From his testimony it is fairly deducible that it was only a nominal amount and was far below 156 ounces. Arthur D. Sparks testified he signed a miner's affidavit on February 11, 1938, in support of the principal affidavit in count 65. It represents that Sparks had delivered 102 ounces of silver to the Colorado Smelting and Refining Company on February 4, 1938, taken from the Gray Eagle mine in Boulder County as lessee. He testified that that amount had been filled in since he signed the affidavit, and that the amount did not exceed 40 ounces. Sparks delivered other small shipments of ore at later dates, 20.69 ounces, 24 ounces, 48 ounces, and either 18.25 or 16.42 ounces.

■ We conceive count 82 of the indictment also to be a good count, that is, there has been stricken from the principal affidavit attached thereto all of subparagraph (2) contained in said affidavit as directed by the Secretary of the Treasury. It was made on behalf of the Colorado Smelting and Refining Company by appellant Swisher on April 26, 1938, and was sworn to before the other appellant. It

represents that Mr. Swisher on that day delivered 1530.61 fine troy ounces of silver to the Denver mint for deposit and sale. The weight seems to have been cut to 1481.75 ounces by the mint weight. It was presented to the mint pursuant to the provisions of the executive proclamations and the rules and regulations made by the Secretary of the Treasury. It stated, "That said silver has been mined on or after January 1, 1938, from natural deposits in the United States or a place subject to the jurisdiction thereof." Said affidavit was delivered with the silver and three miner's affidavits in support of said principal affidavit were also delivered to the mint with said silver. One of them was made by Guy Miles. He deposed in his miner's affidavit that he was lessee of the Nancy mine, the owner being the estate of F. E. Wallace; that he had delivered to the Colorado Smelting and Refining Company on March 25, 1938, 137 fine ounces of silver which was mined on or after January 1, 1938, from natural deposits at the said mine. He testified at the trial that he sold the appellants a little ore in March and April, 1938; that he signed the affidavit and delivered it to the Colorado Smelting and Refining Company; that he didn't deliver 137 ounces of silver to appellants; that the settlement sheet which he received from appellant Gibson showed that the silver amounted to 13.77 ounces. The three truckers who hauled it down received their pay out of the amount the ore was sold for. Other small sums were deducted. Its principal values were in gold. John McDonald's name was signed to a miner's affidavit in support of the principal affidavit in count 82 of the indictment. He was president of the Edgar Extension Mining Company, the owner of a mine known as the King Mine at Soda Springs, Boulder County, Colorado. The affidavit stated that the Edgar Extension Mining Company had delivered to the Colorado Smelting and Refining Company on the 1st day of April, 1938, 1096 fine ounces of silver which was mined on or after January 1, 1938, from natural deposits at the said mine. McDonald testified at the trial that it was low grade in silver, averaging less than an ounce per ton, sometimes ran as high as two ounces. He did not testify that the signature to the affidavit was his. He didn't believe it was his signature, never made an M like that, said he never delivered 1096 ounces of silver to the appellants; and that he couldn't according to the assays. Alfred Jones in his miner's affidavit in support of count 82 of the indictment deposed that he was lessee of Wolcott and Hemingway, owners of the True Blue mine in Boulder County; and that Wolcott and Hemingway delivered to the Colorado Smelting and Refining Company on the 4th day of April, 1938, 292 fine ounces of silver which was mined on or after January 1, 1938, from natural deposits at the said mine; whereas he testified as a witness at the trial of this case that that shipment was below the minimum, and that he received nothing for the silver.

In addition to the miners whose names we have given, many others who made supporting affidavits to defective principal affidavits like that in count 1 of the indictment, testified at the trial that blank spaces in their affidavits were unfilled when they signed them and left them with the Colorado Smelting and Refining Company, and that almost uniformly the number of ounces inserted in those blank spaces was far in excess of the amounts of newly mined silver they respectively delivered to that company. No one testified as to who filled these spaces. There was considerable testimony that shipments of photographic silver, called sludge were received by appellants from different sections of the country for which they paid as much as 50c per ounce for silver content. They maintained magazine advertisements offering to purchase it in which they said: "save your silver sludge with Peerless Hypo Precipitant, We smelt and refine silver from it." It is argued that such silver was used and sold to the mint in place of newly mined silver. There was evidence that other secondary silver (used in arts and industries) was purchased by appellants at their smelter and used to increase their bullion output.

It is therefore concluded, as above indicated, that counts 65 and 82 each charges both appellants with violations of the statute, the proclamations and the regulations relied on, and that the verdicts and judgments of guilt of each appellant on those two counts should be and they are affirmed. Verdicts and judgments of guilt of one or both appellants based on the remaining principal affidavit counts (1, 5, 9, 16, 22, 25, 27, 34, 41, 45, 53, 60 and 70) are reversed and the case remanded as to those counts. Verdicts and judgments of guilt of one or both appellants based on the miner's affidavit counts (3, 8, 13, 15, 17, 18, 19, 23, 24, 26, 32, 33, 35, 36, 37, 38, 39, 43,

44, 48, 54, 63, 64, 66, 77, 83, 84 and 85) are affirmed.

PHILLIPS, Circuit Judge (concurring in part).

■ With respect to those counts based on principal affidavits which contained alternative statements, neither of which was stricken out, it is my opinion that the judgment should be reversed.

In the refining of silver, newly mined silver [1] and other silver are frequently mixed and when the refining process is completed, it is, of course, impossible to determine what part of the mixture is newly mined and what part is other silver. The regulations take cognizance of that situation and provide for delivery to the Mint, for purchase as newly mined silver, either newly mined silver or silver from a mixture of newly mined and other silver. But if the silver tendered for purchase is from a mixture of newly mined and other silver, the amount tendered from the mixture for purchase at the newly mined silver price, plus any part of such mixture theretofore delivered or transferred to a United States Coinage Mint, under the proclamation of April 24, 1935, amending the proclamation of December 21, 1933, as amended, must not exceed the amount of newly mined silver in the mixture.

The principal affidavit upon which count one is predicated in part reads as follows:

" * * * the undersigned hereby represents and certifies under oath that he is the <u>President</u> of Colorado Smelt-
(Title of Officer)      (Name
ing & Refining Co., the owner of certain
of Owner)
silver to the amount of 2951.72 fine troy ounces, more or less, forwarded to the United States Mint at Denver, (Dist) Colo., on the 21st day of February, 1936, and delivered to the Mint under the provisions of said Proclamation of December 21, 1933, as amended, and the Regulations prescribed thereunder; and that said silver* ·(1) (has been mined on or after April 24, 1935 and prior to midnight of December 31, 1937, from natural deposits in the United States or a place subject to the (2) jurisdiction thereof,) [or is part of a mixture of domestic silver and does not, together with any part of such mixture heretofore delivered or transferred by the undersigned to a

United States Coinage Mint under the Proclamation of April 24, 1935, amending the Proclamation of December 21, 1933, as amended, exceed the amount of such mixture which has been mined on or after April 24, 1935 and prior to midnight of December 31, 1937, from natural deposits in the United States or a place subject to the jurisdiction thereof.] * * *" (Parentheses and brackets mine.)

If the silver was in fact wholly newly mined, the part of the affidavit enclosed in brackets should have been stricken out. If the silver was from a mixture, that part in parentheses and the word "or" which follows it, should have been stricken out, under the direction set forth in a note appended to the affidavit form.

Count one of the indictment charged that both statements in the affidavit were false. To establish that the principal affidavit upon which count one is predicated was false the government introduced proof that it was tendered to the Mint with three supporting affidavits, being the supporting affidavits on which counts 2, 3, and 4 are predicated, and that the amount stated in each of such supporting affidavits was largely in excess of the newly mined silver actually sold and delivered to the Refining Company by the affiant thereto. This proof warranted the jury in finding that the quoted portion of the affidavit in parentheses was false. It did not establish, however, that the quoted portion of the affidavit in brackets was false. There was no proof that the silver tendered for purchase with the affidavit set out in count one was not a part of a mixture of newly mined and other silver, and that the part tendered, together with any part of the mixture theretofore delivered or transferred to a United States Coinage Mint as newly mined silver, exceeded the amount of newly mined silver in the mixture. The two statements being in the alternative, the affidavit would not be false if either were true. Therefore, in order to establish that the affidavit was false it was incumbent upon the government to prove that both statements were false.

What I have said respecting count one applies equally to other counts based on principal affidavits containing the alternative statements with respect to the silver.

But I cannot agree that the counts containing alternative statements were duplic-

[1] Silver mined on or after April 24, 1935, from natural deposits in the United States or a place subject to the jurisdiction thereof.

itous. They are predicated on 18 U.S.C.A. § 80, which in part reads as follows:

"* * * or whoever shall knowingly and willfully * * * make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false * * * affidavit, * * *. knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The defendants are not charged with the violation of the Silver Purchase Act, the President's proclamations, nor the regulations promulgated thereunder. See 31 U.S.C.A. § 821. Rather, they are charged with violations of § 80, supra, to-wit, the presenting of a false affidavit in a matter within the jurisdiction of the United States Mint, an agency of the United States. The gist of the offense is knowingly and wilfully making, causing to be made, using, or causing to be used, a false affidavit in a matter within the jurisdiction of the United States Mint. See Capone v. United States, 7 Cir., 51 F.2d 609, 614, 76 A.L.R. 1534.

While the statements in such affidavits were in the alternative, both could be false. The counts predicated thereon charged that both statements were false. In so doing, they did not charge two separate offenses. Rather, they charged the defendants used and caused to be used an affidavit which was false in two particulars. That is to say, that neither of the alternative statements was true and hence the affidavit was false.

It is contended that the trial judge made a misstatement of fact in his charge, which was prejudicial to the defendants. The misstatement was called to the attention of the trial judge and thereupon he instructed the jury that they had heard the evidence and seen the witnesses and must rely upon their own recollection of the testimony and not upon what he had told them. This, I think, cured any error in the charge.

The trial court properly refused to give certain requested instructions which were fully covered in the general charge.

The trial court refused to give the following tendered instruction:

"That they had a right to sell a mixture containing newly mined, domestic, secon-

dary, or foreign silver to an extent equal to the silver contained in ore newly mined and that the percentage of such domestic, secondary or foreign silver was immaterial."

This instruction does not fully state the law and was rightfully refused. It is true the defendants had a right under the regulations to sell as newly mined silver, silver from a mixture containing newly mined, domestic, secondary, or foreign silver. But this right was conditional. It was essential that the amount of silver tendered for purchase as newly mined silver from a mixture, together with the amounts that had theretofore been sold from the mixture as newly mined silver, should not exceed the total amount of newly mined silver in the mixture, and that the silver tendered for purchase should be accompanied by truthful supporting affidavits covering sales from miners of newly mined silver equal to the amount of silver tendered to the Mint for purchase. The tendered instruction should have included the conditions which the regulations attached to the sale of silver as newly mined silver from a mixture.

For the reasons indicated, I concur in the result.

BRATTON, Circuit Judge (concurring in part and dissenting in part).

The record fails to indicate that the counts in the indictment predicated upon principal affidavits were attacked in the trial court by demurrer, motion to quash, or otherwise, for self-contradiction of recitals in such affidavits, and they are not challenged in this court on that ground. The brief of appellants is silent in respect to the matter.

The two recitals are alternative in character, not self-contradictory. As such, they do not render fatally defective and void the counts based on them, and the evidence bearing upon each count was such that the jury could well have found that both were false. That was enough to warrant the verdict, and it is enough to sustain the judgment on appeal.

I am in accord with the views expressed by Judge PHILLIPS in his concurring opinion respecting the comment of the trial court and the instructions.

For the reasons thus outlined in brief, it is my conclusion that the judgment should be affirmed in toto.